UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PAUL BLAIS,

     Plaintiff,

       v.                                                           Civil Action No.

ST. MARY'S HEALTH SYSTEMS AND
COVENANT HEALTH, INC.,

     Defendants.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Paul Blais ("Mr. Blais"), by and through undersigned

counsel, and complains against the Defendants, St. Mary's Health Systems ("St. Mary's") and

Covenant Health, Inc. ("Covenant"), as follows:

JURISDICTION AND PARTIES

1.     This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§

4551, *et seq.,* the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§ 833, *et seq*., and the

False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2.     Mr. Blais is a United States citizen residing in the City of Auburn, County of

Androscoggin, State of Maine.

3.     St. Mary's is a Maine nonprofit corporation with a principal place of business in

the City of Lewiston, County of Androscoggin, State of Maine.

4.     Covenant is a Massachusetts nonprofit corporation with a principal place of

business in the City of Tewksbury, County of Middlesex, Commonwealth of Massachusetts.

5.     St. Mary's is an "employer" as that term is defined in the MHRA and WPA.

6.     Covenant is an "employer" as that term is defined in the MHRA and WPA.

7.     The amount in controversy in this matter exceeds $75,000.

8.     This Court has subject matter jurisdiction over Mr. Blais' federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

9.     On or about June 18, 2020, Mr. Blais filed a timely Complaint of Discrimination against Defendants alleging unlawful whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

10.     On or about December 31, 2020, the MHRC issued a Notice of Right to Sue with respect to Mr. Blais' state law claims.

11.     Mr. Blais has exhausted his administrative remedies with respect to all claims set forth in this Complaint that require administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

12.     Mr. Blais requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

13.     St. Mary's operates St. Mary's Regional Medical Center ("Medical Center"), a 233-bed hospital in Lewiston, Maine.

14.     St. Mary's is part of a complex of care facilities now operated by Covenant.

15.     St. Mary's and Covenant are an integrated enterprise.

16.     At all times material to this case, St. Mary's was a supporting organization of Covenant for purposes of the Internal Revenue Code.

17.     St. Mary's was organized exclusively for benefit of, to perform the functions of, or to carry out the purposes of Covenant.

18.     But for the existence of St. Mary's, Covenant would be responsible for the activities and services performed by St. Mary's.

19.     Covenant is the parent of the Covenant Health System which includes St. Mary's.

20.     The directors, trustees, or membership of Covenant have the power to regularly appoint or elect at least a majority of St. Mary's directors or trustees.

21.     St. Mary's is operated, supervised or controlled by Covenant for purposes of the Internal Revenue Code.

22.     Stephen C. Jorgensen became the president of St. Mary's and senior vice president of Covenant in August 2018.

23.     Mr. Jorgensen acted as set out in this Complaint as an agent and employee of both St. Mary's and Covenant.

24.     Mr. Jorgensen reported to Stephen J. Grubbs, President and CEO of Covenant.

25.     Through Mr. Jorgensen, Covenant had comprehensive control over labor relations at St. Mary's, including but not limited to employment decisions.

26.     For example, Mr. Jorgensen terminated Mr. Blais in his capacity as CEO of St. Mary's and as a Senior VP of Covenant.

27.     In addition, at all times material to this Complaint, Paige Hagerstrom was a Covenant employee with a position of System Director of Talent Management.

28.     In her role, Ms. Hagerstrom was responsible for employee recruitment and employee performance management for employees at St. Mary's including hiring, discipline, and termination of employees.

29.    As set out in more detail below, Ms. Hagerstrom was responsible for managing day to day human resources matters at St. Mary's, including human resources matters relating to Mr. Blais, his protected activity, his reports of retaliation, and the retaliation at issue in this case.

30.    On information and belief, Ms. Hagerstrom was involved in the process that led to Mr. Blais' discipline and termination.

31.    Another Covenant employee, Tammy Crossman, System Director of Infection Prevention was responsible for managing Infection Control at St. Mary's including the supervision of St. Mary's employees.  Ms. Crossman would work a few days per week at St. Mary's.

32.    Mr. Blais was called on to work with managers at two other Covenant hospitals in reviewing policies and brainstorming issues and concerns.

33.    There was a gradual transition of managers to employment with Covenant.  In this context, the nominal employer of managers was not always clear to Mr. Blais who worked with managers employed by St. Mary's, other Covenant hospital entities, and Covenant.

34.    Mr. Blais was told that St. Mary's and Covenant had an open door policy and that it was appropriate for him to bring concerns to whomever in the organization they believed could address them including Covenant employees and including Mr. Grubbs.

35.     St. Mary's and Covenant had shared leadership, shared management, integrated operations, and centralized control of labor relations and were an integrated enterprise.

36.    Mr. Blais was employed by St. Mary's for more than 41 years, from 1978 to April 2020 when he was wrongfully terminated due to MHRA, WPA and FCA discrimination and retaliation.

37.     For the last 25 years of his employment, Mr. Blais was the Director of Environmental Services (EVS).

38.     Mr. Blais facilitated and directed the environmental services program, including Housekeeping and Laundry, at all St. Mary's facilities.

39.     Mr. Blais' final salary was $90,000.

40.     Mr. Blais' direct supervisor before late January/early February 2020 was Scott Young, Director of Facilities.

41.     After that, Mr. Blais' direct supervisor was Aaron Walston, who was the Director of Maintenance before he replaced Mr. Young.

42.     Mr. Blais' job performance was satisfactory or better at all times during his employment.

43.     Mr. Blais' supervisor, Mr. Young, wrote this assessment of Mr. Blais in September 2018:

> "Paul is a consistent, hard-working, creative manager and is always looking for a better, more efficient, and more valuable way to perform EVS and Laundry. I am grateful for Paul's leadership in this challenging division."

44.     Beginning in late 2018, Mr. Blais reported to Mr. Young and Mr. Jorgenson that he had serious concerns about understaffing and the cleanliness of the Medical Center, and that the conditions were putting St. Mary's patients' and employees' health and safety at risk.

45.     Prior to Mr. Blais' reports, Mr. Young and Mr. Jorgenson did not know, or did not want to admit, that the staffing levels had fallen so low that they posed a health and safety risk to patients and employees.

46.     Managing a budget was a major part of Mr. Blais' job.

47.     Recruiting and filling positions within the confines of approved budgets allowed Mr. Blais to successfully provide a safe environment for patients, staff and visitors for over 25 years.

48.     This changed when Mr. Jorgensen became President of St. Mary's and Senior VP of Covenant Health.

49.     Staff vacancies were not getting posted and filled and Mr. Blais was prevented from providing a safe environment.

50.     Mr. Blais' boss, Mr. Young, threatened Mr. Blais' job if he did not "make budget" which meant Mr. Blais needed to keep staffing levels down. Ninety percent of his budget was for staffing.

51.     Mr. Blais made many reports that constitute protected activity under the WPA and FCA (hereinafter, "Protected Activity").

52.     Beginning in May 2019, Mr. Blais was subjected to a series of retaliatory acts, culminating in the termination of his employment on April 14, 2020 (hereinafter, "Retaliation").

53.     Mr. Blais' Protected Activity between late 2018 and May 2019 included the following.

54.     Mr. Blais made oral reports about health and safety concerns in late 2018.

55.     On January 4, 2019, Mr. Blais sent an email to Mr. Young and Mr. Jorgensen regarding the declining state of the Housekeeping Department. Neither one of them responded.

56.     On January 7, 2019, Mr. Blais sent an email to Mr. Young regarding 11 staff vacancies that needed to be filled in order to address the unsafe conditions in the Medical Center. Mr. Young did not respond.

57.     A couple of days later, Mr. Blais spoke to Mr. Young and asked if he could meet with Mr. Jorgensen on his next weekly meeting. He agreed.

58.     On January 10, 2019, Mr. Blais met with Mr. Young and Mr. Jorgensen to review staffing plans and report his continued safety concerns. Mr. Jorgensen immediately cut Mr. Blais off and turned the discussion to focus on the overall budget of the organization.

59.     That same day, January 10, 2019, Mr. Jorgensen approved the hiring of only five out of the 12 vacancies. Mr. Jorgensen had been holding the positions open since November and December of 2018.

60.      Over the next few months, Mr. Blais continued to report concerns regarding the level of cleanliness of the Medical Center to Mr. Young and how this was endangering the safety of patients, visitors and employees. Mr. Young did not want to discuss his concern and did not propose any solutions.

61.     On May 1, 2019, Mr. Blais was in Mr. Young's office to discuss staffing again.

62.     Mr. Young stated that Mr. Blais had to stay within budget no matter what.

63.     Mr. Blais explained again that the budget was unrealistic and that this was having an adverse impact on health and safety.

64.     Mr. Young agreed that the budget was not fair.

65.     Mr. Blais asked what would happen if he went over budget and hired enough employees to keep the Medical Center safe. Mr. Young stated that they would just get rid of him.

66.     On May 2, 2019, Mr. Blais sent an email to Ms. Hagerstrom, with copies to Daniel Deletetsky and Mr. Young, asking if the position control meeting approved the posting of a Housekeeping QA position and three Housekeeping Aide positions.

67.     Ms. Hagerstrom replied that the Housekeeping Aide positions were approved for posting but the QA position was not approved. She said that the QA position put them over budget.

68.     Ms. Hagerstrom wrote, "I know this isn't what you had hoped for…" She suggested that supervisors take responsibility for some of the Quality components.

69.     Mr. Blais disagreed and asked again that the QA position be approved instead of one or two of the Housekeeping Aide positions.

70.     On the morning of May 3, 2019, Mr. Blais sent another email to Ms. Hagerstrom, with copies to Mr. Deletetsky, Mr. Young, and Elizabeth Keene, to stress why it was vitally important to the safety of staff and patients that they hire a QA Specialist now.

71.     Later that day on May 3, 2019, Mr. Young came to Mr. Blais' office and told Mr. Blais, "You can't do that," referring to Mr. Blais' emails reporting concerns about unsafe conditions and about St. Mary's failure to correct the problem.

72.     Retaliation against Mr. Blais began in May 2019 and included the following.

73.     On May 6, 2019, Mr. Blais was asked to meet with HR. He thought the meeting was scheduled to discuss his staffing concerns as the title of the email was "staffing update."

74.     To Mr. Blais' surprise, the purpose of the meeting was to give him a written warning for "professionalism."

75.     This was the first written warning Mr. Blais had received in 41 years.

76.     The allegation that Mr. Blais was unprofessional was unfair and unfounded.

77.     Mr. Blais was rated as "Consistently Exceeds Standards" for his professionalism on his Appraisal Form prepared on August 6, 2018.

78.     Mr. Blais received the same rating on his Appraisal Form prepared on August 17, 2018.

79.     On May 10, 2019, Mr. Blais responded to the unfair and retaliatory written warning with an "In my own words" document as required by policy and sent it to Mr. Young. He also sent a grievance to HR.

80.     Mr. Blais wrote, in part:

"I am very concerned that our staffing levels are reduced below what is needed to maintain safety for patients and staff. We have had a recent CMS citation which is a result of staff shortage and now we're at an even lower level for staffing because of not back filling positions….

"I am frustrated with Paige Hagerstrom, Director of Talent Management and Scott Young's ongoing disregard of my safety concerns due to staffing shortages.

"I continue to receive the same message that they do not want to hear my concerns about safety to patients and staff."

81.     Mr. Blais included ways to improve communication and how their meetings should be moving forward.

82.     Neither Mr. Young nor HR responded to Mr. Blais' recommendations, which deviates from Defendants' own policies.

83.     There was never any response or follow up meeting.

84.     Mr. Blais did not know if his plan for improving communication with Mr. Young was accepted or not.

85.     Mr. Blais' grievance was Protected Activity for purposes of the WPA and the FCA.

86.     Mr. Blais continued to engage in Protected Activity.

87.     On May 13, 2019, during Mr. Blais' weekly meeting with Mr. Young, Mr. Blais told Mr. Young that he continued to be concerned about safety for patients, visitors, and staff

regarding staffing levels. This time, Mr. Young agreed that positions needed to be filled and told Mr. Blais that they should have a side meeting to discuss it further. Mr. Young never followed up and scheduled time to discuss staffing.

88.     On May 21, 2019, Mr. Blais sent an email to Ms. Hagerstrom, Director of Human Resources, regarding his grievance. He wrote, in part, "It is very difficult for me to support people of the organization that place our patients and employees at risk…."

89.     On May 23, 2019, Mr. Blais sent an email to Ms. Hagerstrom and wrote, in part:

> "I have and will continue to support the organization in its responsibilities under Covenants Mission and Values. I am committed to advocating for responsible stewardship that supports appropriate staffing levels and departmental policies to provide safe environments for Covenant patients and staff."

90.     It took over one month for Mr. Blais to get any response to his original grievance instead of the three days called for in the grievance policy.

91.     There were many untruths in the response so he filed an appeal with the Director of Human Resources, Ms. Hagerstrom, which is step 4 of the grievance policy.

92.     Mr. Blais sent his appeal to Ms. Hagerstrom on June 12, 2019.

93.     Mr. Blais received no response, so he sent the appeal to Ms. Hagerstrom again on June 25, 2019.

94.     On July 9, 2019, Mr. Blais received an email from Barbara Gabri in HR stating they did not receive a response from him about moving to the next steps and that they considered the matter closed.

95.     On July 23, 2019, Ms. Hagerstrom said she could not find Mr. Blais' appeal. He sent it again, for the third time.

96.     Defendants admit that they received Mr. Blais' appeal and claim that St. Mary's responded, which is not true. The only reply Mr. Blais received was the May 31, 2019 memo that Mr. Blais appealed.

97.     Mr. Young sent Mr. Blais his 2019 Performance Appraisal by email on September 26, 2019.

98.     Mr. Young acknowledged that he had not been having regular meetings or conversations with Mr. Blais.

99.     Mr. Young rated Mr. Blais as "Meets Standards" with regard to professionalism in spite of the unfair warning issued to Mr. Blais on May 6, 2019.

100.     Mr. Blais continued to engage in Protected Activity.

101.     On October 9, 2019, Mr. Blais met with Ms. Hagerstrom to discuss his appeal. Mr. Blais recounted his prior reports to Mr. Young about understaffing and unsafe conditions. He told Ms. Hagerstrom about urging Mr. Young to let infection control know what was not getting done on a regular basis. For example, contact surfaces were not being cleaned – railings, doorknobs, elevators. The Medical Center was in the 10th percentile nationally in terms of meeting standards for cleanliness. Mr. Blais expressed deep concerns about the health and safety risk this posed for patients, staff and visitors. Mr. Blais told Ms. Hagerstrom that two employees left because the environmental conditions are unsafe. Mr. Blais also told Ms. Hagerstrom that Mr. Young retaliated against him and threatened his job because of his reported concerns about unsafe conditions.

102.     Mr. Blais never received a response to his grievance appeal from the Director of Human Resources, Ms. Hagerstrom.

103.     Mr. Blais was subjected to further retaliation.

104.     The only one who mentioned Mr. Blais' grievance appeal again was Mr. Young.

105.     When Mr. Young issued Mr. Blais a second, retaliatory warning on 01-13-20, he said "Your grievance is done" or "over."

106.     This prompted Mr. Blais to write to Ms. Hagerstrom again to protest her failure to respond to his appeal.

107.     On January 13, 2020, Mr. Blais and Housekeeping Supervisor, Mike Desrosiers, were issued a counseling report by Mr. Young based on a complaint from an employee.

108.     Mr. Young issued the counseling without any investigation.

109.     He did not ask Mr. Blais or Mr. Desrosiers for their side of the story before concluding that they did something wrong.

110.     This is highly unusual and proves that Mr. Young was looking to find fault in Mr. Blais because of his Protected Activity.

111.     Mr. Blais objected to the unfair discipline.

112.     Ms. Gabri and Mr. Young stopped working for Defendants at the end of January 2020.

113.     Before Mr. Young's employment ended, Mr. Jorgensen approached Mr. Blais after a Leadership meeting and spoke about getting together with Mr. Blais within the next few days to come up with a plan to replace Mr. Young.

114.     Three days later, Aaron Walston (then Director of Maintenance) came into Mr. Blais' office and said he was taking Mr. Young's place and would be his new Supervisor.

115.     The meeting with Mr. Jorgensen never happened and Mr. Blais had no input into the plan to replace Mr. Young.

116.    Mr. Walston told Mr. Blais that the "whole situation" he had with HR and Mr. Young was wiped clean and that they were starting new.

117.    Mr. Walston told Mr. Blais that HR handled his previous counselling poorly and that they should have talked to Mr. Blais and Mr. Desrosiers first before issuing the warning.

118.    Mr. Walston told Mr. Blais that HR admitted that Mr. Blais' counselling was not handled properly.

119.    St. Mary's annual DNV[1] survey was scheduled to take place a couple of weeks after Mr. Young left.

120.    As Director of Environmental Services, Ms. Blais had been involved in every survey for the past 20 years.

121.    In the past, Mr. Blais had toured the Medical Center with the surveyors and attended meetings such as Infection Control and daily huddles with them.

122.    When the surveyors showed up in early 2020, Mr. Blais asked Mr. Walston when the tour would begin and where to meet. Mr. Walston said Mr. Blais was not needed.

123.    Mr. Blais was shocked. He asked who was going to do the tour. Mr. Walston told him that the new interim Maintenance supervisor, Aaron Martel, would do it.

124.    Mr. Blais asked again if he could be involved, like always. Mr. Walston said no, they were all set.

125.    Upon information and belief, St. Mary's and Mr. Walston were afraid that Mr. Blais would have told the surveyors about the understaffing and related unsafe conditions.

---

[1] DNV (Det Norske Veritas) is an accrediting agency for acute care and critical access hospitals.

126.    The survey lasted over three days. On day two, Mr. Martel stopped Mr. Blais to say that the surveyors were asking questions about Housekeeping and that he had to guess at the answers.

127.    Mr. Blais continued to engage in Protected Activity.

128.    During his meeting with Mr. Walston on January 28, 2020, Mr. Blais reported that two infection control employees had quit in the past six months. Both employees said the Medical Center was an unsafe place to work.[2]

129.    Mr. Blais reported to Mr. Walton that St. Mary had been an unsafe environment in the past year due to staff vacancies that needed to be filled.

130.    Mr. Blais told Mr. Walston that the Medical Center was at the 25th percentile from the bottom in staffing according to the Deloitte standards.

131.    St. Mary's receives payment for services to patients pursuant to federally funded Medicaid programs administered in Maine as Mainecare.

132.    St. Mary's also receives payments for services to patients pursuant to Medicare.

133.    Centers for Medicare & Medicaid Services (CMS) is the agency that enforces conditions for participating in Medicaid and Medicare.

134.    Compliance with CMS regulations, including 42 CFR § 482.41 - Condition of participation: Physical environment (https://www.law.cornell.edu/cfr/text/42/482.41) and 42 CFR § 482.42 - Condition of participation: Infection prevention and control and antibiotic stewardship programs (https://www.law.cornell.edu/cfr/text/42/482.42) are preconditions for St.

---

[2] St. Mary's conducted two employee surveys between 2017 and 2020. One of the lowest scores from Mr. Blais' staff in both surveys was about staffing shortages. Mr. Blais was supposed to put together a plan to address the worst scores but Mr. Young told him not to address staffing shortages in his plan.

Mary's to maintain provider agreements under Medicare and Medicaid and submit invoices and receive payment for services rendered pursuant to Medicare and Medicaid.

135.    CMS conducted a survey of conditions at St. Mary's in response to a complaint and found dust issues in patient care areas.

136.    The dust found by CMS was a result of the staffing shortages that Mr. Blais had been complaining about.

137.     CMS came back a few months later to follow up on the findings and again observed the violations relating to dust.

138.    Based on numerous failed quality assurance checks performed by his department and others, Mr. Blais believed that St. Mary's was in violation of a number of regulations including but not limited to 42 CFR § 482.41 and 42 CFR § 482.42, including § 482.42(A-3) (maintaining a clean and safe environment to avoid sources of transmission of infection).

139.    Defendants were obligated to comply with the requirements set out as in the CMS regulations as condition of billing and receiving payment under Medicare and Medicaid.

140.    During the timeframe that Defendants failed to comply with the CMS regulations they continue to bill and receive payment from CMS under Medicare and Medicaid.

141.    By failing to comply with the requirements set out in the CMS regulations but continuing to bill and receive payment under Medicare and Medicaid, Defendants engaged in violations of the FCA by false implied and/or express certification with preconditions for payment.

142.    Mr. Blais reported and sought to stop Defendants from engaging in practices which defraud the United States government.

143.    Mr. Blais took steps which could reasonably lead to a False Claims Act claim.

144.    Mr. Blais' concern about Defendants' violations of CMS regulations motivated his reports about unsafe staffing levels.

145.    Mr. Blais' concern that St. Mary's was sending bills and receiving payment for Medicaid and Medicare services without complying with these preconditions for payment motivated his ongoing reports.

146.    In February or March 2020, Brian Krajewski (Housekeeping Supervisor) told Mr. Blais that Mr. Walston approached him and asked if he would be able to do Mr. Blais' job "if anything should happen."

147.    On March 27, 2020, Mr. Jorgensen changed the hours for two positions from regular/first shift to varied hours/shifts without even talking to Mr. Blais. He also held/refused to fill five other vacant positions.

148.    It is nearly impossible to fill a position that has varied hours/shifts.

149.    Mr. Blais asked Mr. Jorgensen to explain his decision. He did not reply.

150.    Mr. Walston told Mr. Blais to stop asking questions and follow instructions.

151.    In the meantime, on March 24, 2020, Mr. Blais received an email from Central Maine Medical Center (CMMC) asking for assistance laundering 250 sets of scrubs daily during the COVID-19 crisis.

152.    CMMC is another hospital located in the City of Lewiston, County of Androscoggin, State of Maine.

153.    Mr. Blais was in favor of assisting CMMC because St. Mary had the ability to do extra laundering and because it would protect patients and employees from COVID-19 and other infections.

154.    Mr. Blais was motivated to assist CMMC because some of CMMC's patients and employees were likely to work at and/or receive services at St. Mary's as well as CMMC.

155.    Mr. Blais believed that helping CMMC control infection would also help protect the health and safety of patients, employees and visitors to St. Mary's.[3]

156.    Mr. Walston and Mr. Jorgensen were not in favor of assisting CMMC.

157.    On April 1, 2020, Mr. Walston sent Mr. Blais an email stating, "Please tell [CMMC] we're very sorry but no, we can't help with their ask at this time."

158.    Mr. Blais continued to engage in Protected Activity.

159.    Mr. Blais responded to Mr. Walston's email, "OK, but for the record, I completely disagree with this decision as we have the resources to do this."

160.    Mr. Blais' email was a report regarding a practice which Mr. Blais reasonably believed would endanger the health and safety of employees, patients, and members of the public.

161.    On April 2, 2020, Mr. Blais wrote an email to Stephen Grubbs:

"Good Morning,

During these difficult times, healthcare systems should be working together to help one another, despite any differences they may have.

I was approached by CMMC for a small favor …something that we definitely can help with.

---

[3] Defendants speculate that Mr. Blais' true motive was to further his chances of obtaining a job at CMMC. The facts do not support Defendants' theory. It is true that Mr. Blais made inquiries about employment with CMMC because the retaliation he was facing gave him concern for his job security. He had no obligation to tell St. Mary's that he was looking for alternative employment. Mr. Blais was told that CMMC had gone with a different candidate on March 20, 2020, four days before CMMC contacted him to ask for assistance with laundry. Mr. Blais had no reason to think that he could get a job at CMMC if he persuaded St. Mary's to help CMMC with its laundry.

Unfortunately, our President feels that we can not do this. Another of his decisions that I am strongly against.[4] We certainly can talk about more of his decisions over the past year and a half should you want to.

Just wanted to make sure you were aware of this.

Thanks."

162.    Mr. Blais sent the email to Mr. Grubbs because he knew that Mr. Grubbs was Mr. Jorgensen's supervisor and was in a position to review and correct Mr. Jorgensen's failure to address Mr. Blais' protected reports and was in a position to review and correct the ongoing retaliation against Mr. Blais for engaging in Protected Activity.

163.    Where St. Mary's and Covenant are an integrated enterprise, a report to Mr. Grubbs was a report to Mr. Blais' employer.

164.    As set out above, it had been made clear to Mr. Blais formally and informally that it was appropriate to report concerns regarding safety, legal compliance, fraud, and retaliation to Covenant generally and Mr. Grubbs specifically.

165.    Mr. Grubbs and Covenant were authorized by St. Mary's to receive and address reports from St. Mary's employees of the nature made by Mr. Blais and Mr. Grubbs.

166.    On April 2, 2020, Mr. Blais received a response from Mr. Grubbs ("I have received your email and discussed your concerns with Mr. Jorgensen. Steve").

167.    Mr. Grubbs was acting on behalf of Mr. Blais when he discussed Mr. Blais' email report with Mr. Jorgensen.

168.    Mr. Blais advocated for assisting CMMC and opposed Mr. Jorgensen's refusal to assist CMMC because he believed that Mr. Jorgensen's decision endangered the health and safety of patients and employees.

---

[4] Mr. Blais was referring to Mr. Jorgensen's failure to address and correct the health and safety risks posed by unsafe staffing levels in the environmental services department.

169.   The final act of retaliation against Mr. Blais was his suspension and termination.

170.   On April 3, 2020, the very next morning after Mr. Blais emailed Mr. Grubb, Mr. Walston and Brenda Laplante, Human Resources, came into Mr. Blais' office and suspended him.

171.   Mr. Walston said that the suspension was for "professional conduct," without any example or explanation.

172.   Mr. Blais asked if this was because of the email he sent Mr. Grubbs. Ms. Laplante said yes, and for other things which they did not want to discuss.

173.   Mr. Blais asked if this was continued retaliation. They did not respond.

174.   Ms. Laplante referred to prior "conversations" and "documentation," which a refers to Mr. Blais' prior Protected Activity and the retaliation against him for that Protected Activity.

175.   No one told Mr. Blais why he was being suspended, or why he was under investigation, and no one asked Mr. Blais to respond to any allegations against him.

176.   Mr. Blais was treated as if he was being fired on April 3, 2020.

177.   Ms. LaPlante and Mr. Walston told him to turn in his keys and badge and to clear out his office. They had security escort him out of the building. By the end of the day, Mr. Blais was unable to access his work email account.

178.   Mr. Blais received written notice of his termination on April 14, 2020 in an email from Ms. Laplante.[5]

---

[5] Ms. Laplante claimed that they tried to contact Mr. Blais on three separate occasions which is not true. The only contact was on April 8, 2020, from Mr. Walston. He left Mr. Blais a voice mail stating that he was calling about Mr. Blais' "status" and asked Mr. Blais to call them back. Mr. Blais texted Mr. Walston the following day and asked him to please leave a voice message with the results, followed by a hard copy by mail. Mr. Blais told Mr. Walston he would respond with questions or concerns as needed. Mr. Blais received notice that Mr. Walston read his text. He did not reply.

179.     Plaintiff has established a whistleblower retaliation claim in that (1) he engaged in a protected activity; (2) Defendants took adverse employment actions him, and (3) there was a causal connection between the two.

180.     Plaintiff has established a False Claims Act retaliation claim in that (1) he engaged in protected activity, (2) Defendants were aware of his protected activity and (3) he was discriminated against because of the protected activity.

181.     <u>Protected activity:</u> Mr. Blais, acting in good faith, reported orally and in writing to the employer and/or an agent of the employer (Mr. Young, Mr. Mr. Walston, Mr. Jorgensen, Ms. Hagerstrom and Mr. Grubbs) what Mr. Blais had reasonable cause to believe was a violation of CMS regulations as well as conditions or practices that put at risk the health or safety of St. Mary's patients, employees and the visitors.

182.     The dates and substance of his protected reports are set forth above. They include but are not limited to:

- Mr. Blais reported orally that the health and safety of patients, visitors and employees was at risk due to the low level of cleanliness caused by understaffing.
- Mr. Blais reported, orally and in writing, that staffing levels were reduced below what is needed to maintain safety for patients and staff.
- Mr. Blais reported, orally and in writing, that conditions had fallen below the standards set forth in CMS regulations as evidenced by a CMS citation. He reported his good faith belief that the violation was caused by staff shortage.
- Mr. Blais reported, orally and in writing, that staff were quitting because they felt that the environmental conditions were unsafe.
- Mr. Blais reported, orally and in writing, that contact surfaces (railings, doorknobs, elevators) were not being cleaned and that infection control needed to know what was not getting done on a regular basis.
- Mr. Blais reported, orally and in writing, that the refusal to assist CMMC with laundering scrubs which he reasonably believed endangered the health and safety of employees, patients, and members of the public.
- Mr. Blais reports, orally and in writing, that he was being subjected to unlawful retaliation in the form of unwarranted discipline.

183.     Mr. Blais had reasonable cause to report these concerns. His belief that the conditions were unsafe and violated CMS regulations was based on his decades of experience in his role as Director of Environmental Services. Staff who had direct knowledge and experience were quitting because the conditions were unsafe. CMS cited St. Mary for violating retaliations.

184.     Mr. Blais reported these concerns because he believed that the failure to adequately clean the facilities endangered the health and safety of patients and employees, deviated from the standards of patient care (cleanliness and safety) to which the patients are entitled, and violated regulatory requirements including preconditions for St. Mary's receipt of Medicare and Medicaid payments and that Defendants submission of claims and receipt of payments were therefore inappropriate and fraudulent.

185.     Defendants were not doing anything to address the concerns raised by Mr. Blais.

186.     Defendants did not respond to his reported concerns.

187.     Defendants told Mr. Blais to stop sending emails about the problems.

188.     Defendants told Mr. Blais that his job was in jeopardy when he would not be silent.

189.     Mr. Blais engaged in conduct in furtherance of an action under the FCA and action that reasonable could lead to a viable FCA action.

190.     Adverse actions: Mr. Blais suffered adverse employment actions including unfair discipline, threats of discipline, threats of termination, suspension, and termination.

191.     Causal connection: Mr. Blais was removed from his job one day after he escalated his reported concerns beyond St. Mary's to the leader of Covenant, Mr. Grubb, and then was terminated.

192.    The impetus for Mr. Blais to reach out to Mr. Grubb by email was to report that Mr. Jorgensen's refusal to help CMMC with its laundry needs put patients and employees at risk.

193.    Mr. Blais also communicated his intent to report to Mr. Grubb that Mr. Jorgensen refusal to increase staffing for environmental services was putting people at risk and violating CMS regulations.

194.    Mr. Jorgensen knew what Mr. Blais was talking about when he wrote, "Another of his decisions that I am strongly against. We certainly can talk about more of his decisions over the past year and a half should you want to."

195.    In response, Mr. Blais was immediately removed from his position and cut off from communicating with anyone else within St. Mary's and Covenant.

196.    Ms. Laplante and Mr. Walston told Mr. Blais that he was that the suspended because of the email he sent Mr. Grubbs.

197.    Timing also provides the causal connection between Mr. Blais' final protected report and his termination.

198.    Defendants' stated reason for terminating Mr. Blais is "unprofessionalism" which is untrue and pretextual.

199.    Mr. Blais' email to Mr. Grubb was direct but not unprofessional.

200.    Previous accusations against Mr. Blais for unprofessional conduct were unfounded and motivated by retaliation.

201.    An honest assessment of Mr. Blais' professionalism was stated in the last performance review he received prior to termination. In that review, Mr. Blais was rated "Consistently Exceeds Standards," and praised for his professional demeanor and ability to work well with customers.

202.     Mr. Blais was  disciplined, suspended and fired due to whistleblower retaliation.

203.     In addition to constituting an integrated enterprise with St. Mary's, Covenant is also liable for the retaliation against Mr. Blais under 5 M.R.S. §4633 where employees of Covenant, including but not limited to Mr. Jorgensen and Ms. Hagerstrom, discriminated against Mr. Blais because he opposed acts and practices made unlawful under the MHRA (and the MWPA as incorporated into the MHRA) and coerced, intimidated, threatened and interfered with Mr. Blais exercise and enjoyment of rights granted and protected by the MHRA (and the MWPA as incorporated into the MHRA).

204.     Mr. Blais was disciplined, suspended and fired because he engaged in activity protected by the False Claims Act.

<u>COUNT I: MHRA and WPA</u>

205.     Paragraphs 1-204 are incorporated by reference.

206.     The MHRA makes it unlawful for an employer to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions that are protected under the WPA.

207.     The WPA makes it unlawful for an employer to discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting in good faith, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of Maine or the United States, or what the employee has reasonable cause to believe is a condition or practice that would put at risk the

health or safety of any individual or what the employee has reasonable cause to believe is a deviation from the applicable standard of patient care.

208.    The MHRA makes it unlawful for any person to discriminate against any individual for engaging in protected activity as set out in §4633.

209.    Defendants' conduct violates the MHRA and WPA.

<u>COUNT II: FCA Retaliation</u>

210.    Paragraphs 1-209 are incorporated by reference.

211.    The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

212.    Defendants' conduct violates the FCA.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendants to be in violation of his rights;

B.    Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' retaliation;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.      Award liquidated damages in an amount to be determined at trial;

I.      Award nominal damages;

J.      Award attorney's fees, including legal expenses, and costs;

K.      Award prejudgment interest;

L.      Permanently enjoin Defendants from engaging in any employment practices that violate the MHRA, WPA and/or FCA;

M.      Require the CEOs of Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate retaliation in the future;

N.      Require that Defendants post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendants train all management level employees on the protections afforded by the MHRA, WPA and FCA;

P.      Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated him because of retaliation; and

Q.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated: March 4, 2021                          /s/ Chad T. Hansen
                                              Chad T. Hansen
                                              Attorney for the Plaintiff

                                              EMPLOYEE RIGHTS GROUP
                                              92 Exchange Street 2nd floor
                                              Portland, Maine 04101
                                              Tel. (207) 874-0905
                                              Fax (207) 874-0343
                                              chad@employeerightslaw.attorney